UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

-------------------------------------------------------------- x
ALI RICHARD,                                                   :
                                                               :
                                   Plaintiff,                  :
                                                               :        **ORDER DENYING**
               -against-                                       :        **PRELIMINARY**
                                                               :        **INJUNCTION**
STEVEN R. STROM et al.,                                        :
                                                               :        3:18-CV-1451 (VDO)
                                   Defendants.                 :
                                                               :
                                                               x
-------------------------------------------------------------- 

**VERNON D. OLIVER**, United States District Judge:

Plaintiff Ali Richard believes that wearing a red prayer fez is an essential component of his religious practice. But as an inmate in the custody of the Connecticut Department of Correction, Richard could not wear a fez without permission from prison administrators. He sought that permission, but prison administrators concluded that a fez would present security risks in a prison environment and rejected his requests.

Richard—a member of the Moorish Science Temple of America—now seeks recourse from the courts pursuant to a federal law that protects the religious exercise rights of prisoners. During the pendency of this suit, the Department of Correction updated its position, and the issues before the Court have narrowed substantially. Richard is now permitted to wear a red fez in his cell and during religious services, and a white or black fez at all other times. But because Richard believes that wearing a red fez at all times is central to his relationship with God, he now seeks a preliminary injunction to provide an immediate remedy.

The Court concludes that Richard is clearly likely to succeed in showing that restrictions on the color of the fez substantially burden the exercise of his sincerely held

religious beliefs. But prison officials persuasively argue that this policy is the least restrictive means to resist prison gangs that utilize the color red and thereby enhance prison safety. At this preliminary stage, the Court concludes that Richard has not demonstrated that he is clearly likely to successfully show otherwise. The Court therefore denies Richard's request for a preliminary injunction.

## I.    BACKGROUND

### A.    Procedural history

The Court addresses the factual background for Richard's request where relevant to evaluating the preliminary injunction factors. But, to begin, understanding the labyrinthine procedural history of this dispute is necessary to make sense of the unusual posture of the motion. The suit underlying this motion was first filed more than six and a half years ago.[1] Richard's operative complaint names thirteen officials at MacDougall-Walker Correctional Institution (where Richard was then incarcerated) as defendants in their individual and official capacities.[2] Richard brought claims under the First, Fifth, and Fourteenth Amendments, 42 U.S.C. § 1983, the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA"), 42 U.S.C. § 2000cc *et seq*., and the Connecticut Constitution.

According to the operative complaint, Richard's claims stemmed from three events: (1) the rejection of his requests for permission to wear a fez; (2) the removal of return addresses

---

[1] Compl., ECF No. 1. Shortly thereafter, Richard filed an amended complaint that now governs. Amend. Compl., ECF No. 6.

[2] Amend. Compl. at 2, 3 ¶ 1.

from mailings sent by religious leaders to Richard; and (3) the return of a religious book that Richard had ordered, in retaliation for his previous complaints against the mailroom staff.[3]

Because Richard is a prisoner and Defendants are government employees, his amended complaint was screened to determine whether any of his claims were legally deficient and therefore subject to immediate dismissal. *See* 28 U.S.C. § 1915A; *Abbas v. Dixon*, 480 F.3d 636, 639 (2d Cir. 2007). In that initial review, the Court (Haight, J.) dismissed several of Richard's claims. *Richard v. Strom*, No. 18-CV-1451 (CSH), 2018 WL 6050898, at *9 (D. Conn. Nov. 19, 2018). Defendants then moved to dismiss some of Richard's remaining claims,[4] and the Court granted that motion. *Richard v. Strom*, No. 18-CV-1451 (CSH), 2019 WL 2015902, at *1 (D. Conn. May 7, 2019). After these two rulings, the following claims remained: Richard's RLUIPA claims, his First Amendment claims for injunctive relief relating to his fez request, and his First Amendment and federal retaliation claims relating to the book purchase.

### B.    Richard's motion for a preliminary injunction

The Parties then embarked on a protracted period of discovery. In October 2020, almost exactly a year and a half after the initial deadline for the completion of discovery, Richard sought expedited relief by moving for a preliminary injunction on the basis of his RLUIPA claims for the denial of the fez.[5] Specifically, Richard sought an injunction requiring Defendants to allow him "to purchase, possess, and wear a red spiritual prayer fez."[6]

---

[3] *See generally* Amend. Compl. at 2–13.

[4] Mot. to Dismiss, ECF No. 27.

[5] Mot. for Prelim. Inj., ECF No. 63.

[6] Mot. for Prelim. Inj. at 1.

Defendants opposed the motion,[7] and the Court held an evidentiary hearing spanning one full day and one partial day in June of 2021.[8] Until this point, Richard was proceeding *pro se*, and he represented himself throughout the evidentiary hearing. Following the evidentiary hearing, however, the Court appointed Richard *pro bono* counsel.[9]

Nearly four years have passed since the evidentiary hearing. During these four years, briefing on the preliminary injunction motion was restarted from the beginning, and the case was transferred to a different judge for the first time. Following this initial transfer, the Parties met with a magistrate judge to discuss whether this dispute could be settled. In October 2024, after these talks proved unsuccessful, supplemental briefing was ordered to clarify the remaining disputes between the Parties.

In January 2025, this action was transferred for a second time, this time to the undersigned. Supplemental briefing in this action has now concluded, and the Court is prepared to issue its ruling. This Court has conducted a careful review of the hearing transcript and accompanying exhibits.

Because the hearing produced a significant record, the Court concludes that it can adjudicate the preliminary injunction motion on the basis of the evidence in the record.

---

[7] ECF No. 65.

[8] *See* ECF Nos. 70, 71.

[9] ECF No. 77. Because Richard represented himself for a part of the litigation before the appointment of counsel, the Court will liberally construe his *pro se* filings, *see Tracy v. Freshwater*, 623 F.3d 90, 101 (2d Cir. 2010), but will hold filings from his appointed counsel to the same standard as any counseled filing.

## II.    DISCUSSION

### A.    Legal Standard

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.,* 555 U.S. 7, 24 (2008).[10] "The typical preliminary injunction is prohibitory and generally seeks only to maintain the status quo pending a trial on the merits." *Tom Doherty Assocs., Inc. v. Saban Ent., Inc.*, 60 F.3d 27, 34 (2d Cir. 1995). In contrast to "prohibitory" injunctions, an injunction seeking to alter the status quo is considered "mandatory." *N. Am. Soccer League, LLC v. United States Soccer Fed'n, Inc.*, 883 F.3d 32, 36 (2d Cir. 2018).

Generally, a plaintiff seeking a preliminary injunction bears the burden of establishing "(1) irreparable harm; (2) either a likelihood of success on the merits or both serious questions on the merits and a balance of hardships decidedly favoring the moving party; and (3) that a preliminary injunction is in the public interest." *Id.* at 37. Where, as here, a party seeks to alter the status quo through a mandatory injunction, they "must meet a heightened legal standard by showing a *clear or substantial* likelihood of success on the merits." *Id.* (emphasis added).[11]

---

[10] Unless otherwise indicated, this order omits internal quotation marks, alterations, citations, and footnotes in text quoted from court decisions, and adopts alterations contained therein.

[11] Defendants argue that this standard is further heightened in some unspecified way if the injunctive relief sought would bind "state or municipal officials." Def.'s Supp. Br., ECF No. 121, at 3–4. The Court cannot find support for this proposition in caselaw.

Defendants cite two lines of cases for this proposition. First, they cite cases from this District for the proposition that a federal court should grant injunctive relief against a state or municipal official "only in situations of most compelling necessity[.]" *Vorbeck v. McNeal*, 407 F. Supp. 733, 739 (E.D. Mo.), *aff'd*, 426 U.S. 943 (1976). But the Court can discern no adoption (precedential or otherwise) of this quote or the principle contained therein by either the Court of Appeals or the Supreme Court. That the quoted case was later affirmed by the Supreme Court is of no moment

The Supreme Court has explained that Congress enacted RLUIPA to provide "greater protection for religious exercise than is available under the First Amendment." *Holt v. Hobbs*, 574 U.S. 352, 357 (2015). To that end, RLUIPA provides that "[n]o government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution, . . . unless the government demonstrates that imposition of the burden on that person (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000cc–1(a).[12]

---

where, as here, the Supreme Court's affirmance did not include language adopting or endorsing that portion of the district court's reasoning.

Rather than supporting Defendants' contention that the heightened standard for a mandatory injunction is raised further still when the defendants are government officials, the second line of cases actually confirms that the normal mandatory injunction standard governs such cases. Defendants cite cases that rely on *D.D. ex rel. V.D. v. N.Y.C. Bd. of Educ.*, 465 F.3d 503, 510 (2d Cir. 2006), *opinion amended on denial of reh'g*, 480 F.3d 138 (2d Cir. 2007), for precedential authority. *D.D. ex rel.*, however, states only that when a party seeks a mandatory injunction against the government, the heightened "clear or substantial showing of a likelihood of success" standard that would apply to any mandatory injunction request is "especially appropriate" in light of the government defendants. *Id.* at 510.

Put otherwise, *D.D. ex rel.* affirms only the unremarkable proposition that the mandatory injunction standard applies when a plaintiff seeks a mandatory injunction against government defendants. Nowhere, however, does *D.D. ex rel.* announce a *further* heightened standard where a requested injunction is both (1) mandatory and (2) sought against government defendants.

Moreover, the Second Circuit has continued to apply the clear likelihood of success standard to mandatory injunctions sought against governmental actors, but it has not required a showing beyond that standard. *See, e.g.*, *Pharaohs GC, Inc. v. U.S. Small Bus. Admin.*, 990 F.3d 217, 231–32 (2d Cir. 2021); *Jordan v. N.Y.C. Bd. of Elections*, 816 F. App'x 599, 602 n.2 (2d Cir. 2020) (summary order).

Neither line of caselaw, therefore, supports the proposition that the heightened standard applied to mandatory injunctions is heightened further still when the mandatory injunction is sought against government defendants. Richard, therefore, must show a clear or substantial likelihood of success on the merits—not more, not less.

[12] Because RLUIPA affords more protection than the First Amendment, the Court's conclusion that Richard has not shown a clear or substantial likelihood of success on the merits of his RLUIPA

**B.    Parameters of Richard's requested injunction**

In this action, the lines of dispute between the Parties have been a moving target. That is not necessarily a bad thing—instead, it could reflect conformity with federal law's command that "prison officials and incarcerated individuals . . . act in good faith in resolving disputes[.]" *Ramirez v. Collier*, 595 U.S. 411, 437 (2022) (Sotomayor, J., concurring). When Richard first moved for a preliminary injunction in October 2020, he sought an injunction requiring Defendants "to allow [him] to purchase, possess and wear a red spiritual prayer fez[.]"[13] At that time, he was allowed to purchase and wear a fez only in "a neutral color, such as white or black."[14]

But in Defendants' words, "[s]ince the hearing and briefing in this case, the Department of Correction ["DOC"] has attempted to further accommodate [Richard's] religious practices[.]"[15] "Specifically, the DOC has offered [Richard] the ability to purchase, possess, and wear a red or burgundy fez with a black tassel, provided [that he] is only permitted to wear the fez while he is in his cell and when he is at religious services."[16]

As a result, Richard has now received much of the relief that he originally sought. Mindful of its constitutional obligation to adjudicate only live cases or controversies, the Court declines to adjudicate the portions of Richard's request for relief to which Defendants have already acceded. *See Moore v. Consol. Edison Co. of N.Y.*, 409 F.3d 506, 509 (2d Cir. 2005).

---

claims is therefore also dispositive as to whether he can show a clear likelihood of success on his First Amendment claims.

[13] Mot. for Prelim. Inj. at 1.

[14] Def.'s Ex. J., ECF No. 80-2, at 21.

[15] Def.'s Supp. Br. at 2.

[16] *Id.*

At this point, only two narrow issues remain disputed: (1) whether Richard may wear a red fez at all times, or, instead, whether he may wear a red fez only in his cell and during religious services while wearing a neutral-colored fez at any other time; and (2) whether Richard may, as he requests, wear a fez of eighteen inches in height with a tassel longer than eleven and a half inches, or, as Defendants have offered, whether the fez Richard wears may be limited to only twelve inches in height with a tassel of eleven and a half inches. These two issues remain contested and are ripe for adjudication.

Lastly, a request for a preliminary injunction is not all-or-nothing; an injunction may be granted in part and denied in part where the movant meets the applicable standard only as to some portion of their requested relief. *See, e.g.*, *IME Watchdog, Inc. v. Gelardi*, No. 22-CV-1032 (PKC), 2022 WL 1525486, at *9-10 (E.D.N.Y. May 13, 2022). Put otherwise, failing to meet the standard as to one issue does not require the denial of Richard's entire motion, so both claims must be resolved.

## C.    Exhaustion of administrative remedies

As a threshold matter, Defendants raise the affirmative defense of non-exhaustion. They argue that Richard has failed to exhaust all of the administrative remedies available to him as to both his request to wear a fez that is red and his request for a fez approximately eighteen inches in height with a tassel longer than 11.5 inches. "Under the [Prison Litigation Reform Act], 'a prisoner confined in any jail, prison, or other correctional facility' may not bring an action 'with respect to prison conditions . . . until such administrative remedies as are available are exhausted.'" *Green Haven Prison Preparative Meeting of Religious Soc'y of Friends v. N.Y. State Dep't of Corr. & Cmty. Supervision*, 16 F.4th 67, 80 (2d Cir. 2021) (quoting 42 U.S.C. § 1997e(a), hereinafter, "PLRA"). Before Richard can show that he

deserves a preliminary injunction, he must show that a court can even examine the merits of his motion. To do so, he must show that he is clearly likely to succeed in proving that he exhausted his administrative remedies.

"The PLRA requires 'proper exhaustion' of administrative remedies, meaning exhaustion in 'compliance with an agency's deadlines and other critical procedural rules,' using all steps that the agency holds out, and doing so properly." *Id.* at 81 (quoting *Woodford v. Ngo*, 548 U.S. 81, 90 (2006)). And each claim must itself be exhausted: Exhaustion as to some claims does not excuse failure to exhaust other (even related) claims. *Jones v. Bock*, 549 U.S. 199, 220, 222–24 (2007) ("[a] typical PLRA suit with multiple claims" may proceed as to only the exhausted claims where some claims are properly exhausted and others are not). "To exhaust a particular claim, a prisoner 'must provide enough information about the conduct of which they complain to allow prison officials to take appropriate responsive measures.'" *Fluker v. Kelly*, No. 23-307, 2024 WL 506578, at *1 (2d Cir. Feb. 9, 2024) (quoting *Johnson v. Testman*, 380 F.3d 691, 697 (2d Cir. 2004)). That is, the plaintiff must have provided sufficient information to allow "the agency [to] address[] the issues on the merits" for each claim. *Woodford*, 548 U.S. at 90.

In its Administrative Directives, the DOC sets forth the procedures available for an inmate to seek resolution of a conflict through internal prison processes.[17] For inmates in the

---

[17] The Court takes judicial notice of the DOC Administrative Directives pursuant to Federal Rule of Evidence 201. *See Germano v. Quiros*, No. 22-CV-600 (SALM), 2022 WL 3027864, at *7 n.8 (D. Conn. Aug. 1, 2022). Specifically, the Court takes judicial notice of Administrative Directive 9.6, "Inmate Administrative Remedies." Conn. Dep't of Corr. (Apr. 30, 2021), https://portal.ct.gov/-/media/DOC/Pdf/Ad/ad0906pdf.pdf (hereinafter, "*Inmate Administrative Remedies*" or "Administrative Directive 9.6").

DOC's custody like Richard, these are the administrative remedies that must be exhausted to satisfy the PLRA's requirements. *Germano*, 2022 WL 3027864, at *7 n.8.

First, an inmate must attempt informal resolution by verbally discussing the issue with the "appropriate staff member" or by filing an "Inmate Request Form" that "clearly state[s] the problem and the action requested to remedy the issue." *Inmate Administrative Remedies* at (6)(a)(i)(1–4(a)).[18] Once the inmate receives a response that they believe to be unsatisfactory, the inmate may then file a Level I Grievance. *Id.* at (6)(a)(ii)(1). If the Level 1 Grievance is denied or receives no response, the inmate may "request an administrative reconsideration" of that determination by filing a Level 2 Grievance. *Id.* at (6)(b)(ii)(1–2). *Inmate Administrative Remedies* provides that "Level 2 reviews shall be the final level of review of all grievances unless the appeal meets the requirements for a Level 3 review as identified in this directive." *Id.* at (6)(b)(ii)(6). An inmate may file a Level 3 review for appeal of their Level 2 decision only if the appeal "challenge[s] Department-level policy, . . . the integrity of the Administrative Remedies procedure[,] . . . or [w]hen a Level 2 response is not issued . . . within the required time frame." *Id.* at (6)(b)(iii)(1)(a-c).

### 1.    Failure to submit a Level 3 Grievance

Defendants argue that Richard's failure to appeal to Level 3 means that he failed to exhaust all of his administrative remedies as to all of his claims. Though Richard did file (1) a request with the Religious Review Committee, (2) a request for informal resolution, (3) a Level

---

[18] Defendants assert that at a "minimum," an inmate must file a written request at this stage. Def.'s Supp. Br. at 14. Not so, according to Defendants' own citation to Administrative Directive 9.6. Instead, Administrative Directive 9.6 offers inmates a choice: "The inmate may attempt to resolve the issue verbally" or, "[i]f the inmate chooses not to attempt to resolve the issue verbally[,] the inmate shall submit" a written request. *Inmate Administrative Remedies* at (6)(a)(i)(2), (3).

1 Grievance, and (4) a Level 2 Grievance, he did not file a Level 3 Grievance.[19] Defendants contend that Richard has thus failed to meet the PLRA's "mandate that an inmate exhaust 'such administrative remedies as are available' before bringing suit to challenge prison conditions." *Ross v. Blake*, 578 U.S. 632, 635 (2016) (quoting 42 U.S.C. § 1997e(a)).

But the Supreme Court has taken pains to "underscore that statute's built-in exception to the exhaustion requirement: A prisoner need not exhaust remedies if they are not 'available.'" *Id.* Or, put otherwise, "the exhaustion requirement hinges on the 'availab[ility]' of administrative remedies: An inmate . . . must exhaust available remedies, but need not exhaust unavailable ones." *Id.* at 642. The brief response that Richard received to his Level 2 grievance checked a box indicating: "You have exhausted the Department's Administrative Remedies. Appeal to Level 3 will not be answered."[20] As a result of this representation, Richard contends that appeal to Level 3 was not an available administrative remedy, or that if it was available, Defendants' affirmative representation that it was unavailable estops them from raising his failure to appeal to Level 3 in support of a claim of non-exhaustion because Defendants prompted that failure.[21]

The Court agrees with Richard. In the Court's view, Defendants are in a bind: Either (1) Richard could not have received a response to a Level 3 Grievance, in which case that

---

[19] Pl.'s Supp. Br., ECF No. 123, at 1–2. It is not entirely clear whether Richard was permitted to file for Level 3 review under the DOC's own procedures. The *Inmate Administrative Remedies* provides that inmates can appeal to Level 3 only in the limited circumstances described above. It appears that the only specified circumstance which could apply here is an allowance for appeals that "challenge[] Department-level policy." Perhaps the dispute over the fez does so, though it is not obvious whether, for the DOC's purposes, Richard was challenging an overt policy or the adjudication of an individual request for religious accommodation.

[20] Def.'s Ex. F, ECF No. 80-2, at 13.

[21] Pl.'s Supp. Br. at 1–2.

administrative remedy was patently unavailable, or (2) Richard might have received a response at Level 3, in which case Defendants affirmatively misled Richard as to whether he had exhausted his administrative remedies in a manner that would convince any reasonable person not to appeal.

"The test for deciding whether the ordinary grievance procedures were available is an objective one: that is, would a similarly situated individual of ordinary firmness have deemed them available." *Edwards v. Arocho*, 125 F.4th 336, 347 (2d Cir. 2024). "A grievance procedure is not 'available' if it operates as a simple dead end[.]" *Id.* If Richard actually would not have received a reply from Level 3—put otherwise, if the response Richard received to his Level 2 grievance was true—then appeal to Level 3 was a dead end, rendering Level 3 an unavailable remedy. Or, put otherwise, an individual of "ordinary firmness" would not have pursued the fool's errand of appealing.

If, on the other hand, Richard might have received a response to a Level 3 Grievance despite what the Level 2 response claimed, then Defendants affirmatively misrepresented to Richard how he should exhaust his administrative remedies. There can be no argument to the contrary: The checked box stated that Richard "ha[d] exhausted the Department's Administrative Remedies." If that statement was false, it would be remarkable for Defendants to pull the rug out from under Richard seven years into this litigation and claim that he should have appealed to Level 3 regardless.

The Second Circuit has consistently held that exhaustion is not mandatory where defendants have "acted in such as way as to estop them from raising the defense[.]" *Ruggiero v. Cnty. of Orange*, 467 F.3d 170, 175 (2d Cir. 2006). More specifically, failure to exhaust "is an affirmative defense subject to estoppel in cases where prison officials inhibit an inmate's

ability to utilize administrative grievance procedures." *Giano v. Goord*, 380 F.3d 670, 677 (2d

Cir. 2004), *abrogated in part on other grounds by Ross*, 578 U.S. 632. [22]

A defendant's affirmative steps to prevent a plaintiff from exhausting his administrative

remedies are the paradigmatic example of an action that estops defendants from later raising

non-exhaustion. *Ruggiero*, 467 F.3d at 178. In this case, Defendants' affirmative, explicit

misrepresentation clearly prevented Richard from filing a Level 3 Grievance. Defendants, in

substance, told Richard that relief from Level 3 was unavailable to him: If that was untrue,

Defendants clearly inhibited his ability to utilize the sole remaining administrative remedy,

and are estopped from raising the defense of non-exhaustion on this particular ground. [23]

---

[22] Nearly fifteen years ago, the Second Circuit noted that *Woodford*, 548 U.S. 81, raised doubts as to whether estoppel may preclude defendants from raising the defense of non-exhaustion. *Amador v. Andrews*, 655 F.3d 89, 102 (2d Cir. 2011). *Ross* later clarified *Woodford* and held that there was no "special circumstances" exception to the PLRA's exhaustion requirement, but it did not address whether defendants may be estopped from raising the defense of non-exhaustion altogether. 578 U.S. at 635. And, following *Ross*, courts in this Circuit have continued to evaluate whether a defendant is estopped from raising exhaustion without discussion of the continued viability of exhaustion. *See, e.g.*, *Matthews v. Sweeney*, No. 17-CV-0503 (GTS), 2025 WL 447734, at *5 (N.D.N.Y. Feb. 10, 2025); *McCray v. Carter*, No. 21-CV-9051 (GWG), 2022 WL 6854524, at *4 (S.D.N.Y. Oct. 12, 2022), *report and recommendation adopted*, No. 21-CV-9051 (PAE), 2022 WL 16541173 (S.D.N.Y. Oct. 27, 2022).

But whether this doctrine remains good law is of no significance in this case. Even if estoppel could no longer preclude Defendants from raising the defense of non-exhaustion, the Court concludes that Richard is clearly likely to be able to show that exhaustion was unavailable because Defendants provide no reason to doubt their earlier statement that Richard could not have received relief as a result of appeal to Level 3. At its core, their argument suggests that because Richard did not appeal to Level 3, we cannot know whether he would have received a response. Perhaps we cannot know with absolute certainty what would have happened in a hypothetical counterfactual, but that ontological limitation does not provide an affirmative reason for the Court to doubt the veracity of the claim itself. The Court takes Defendants at their word, and concludes that even if estoppel does not apply, Richard is clearly likely to be able to show that Level 3 was not available to him.

[23] Defendants cite several cases for the proposition that "the fact that a DOC representative checks a box indicating that remedies have been exhausted is not dispositive of the issue as multiple judges

within this District have rejected similar arguments and found a lack of exhaustion despite this." Def.'s Supp. Rep. Br., ECF No. 124, at 1.

The Court has reviewed each of the cited cases and concludes that they are not relevant to this action because the checked box was not the purported cause of the failure to exhaust in those cases. Instead, in each case, some failure to exhaust predating the box-checking prevented these courts from examining the issue of estoppel.

In *Lindsay v. Chapdeliane*, No. 19-CV-826 (JCH), 2021 WL 752841 (D. Conn. Feb. 19, 2021), for example, the court concluded that checking of a similar box in response to a Level 1 grievance form did not excuse the fact that the filed Level 1 grievance *itself* was fatally flawed. *Id.* at *7. In other words, the Court held that the plaintiff had failed to exhaust their administrative remedies before the box was checked.

Similarly, *Jordan v. Gifford*, No. 19-CV-1628 (CSH), 2022 WL 3106965, at *18 (D. Conn. Aug. 4, 2022), *adhered to on reconsideration*, No. 19-CV-1628 (CSH), 2023 WL 2895883 (D. Conn. Apr. 11, 2023), does not address estoppel or unavailability. Instead, as was made clear on reconsideration, that case concludes that the prisoner availed himself of the wrong process to bring his claims, again raising an issue with the plaintiff's attempted exhaustion that is antecedent to the issue of the checked box. 2023 WL 2895883, at *5.

Next, Defendants cite *Paschal-Barros v. Kenny*, No. 18-CV-1870 (VLB), 2019 WL 2720739, at *5 (D. Conn. June 28, 2019). Exhaustion in that case yet again turned on an antecedent procedural issue with the grievance itself that precluded the plaintiff from showing exhaustion before the box was checked. The full discussion reads: "It is clear from the pleadings and the attached exhibits that the plaintiff did not grieve the December 5, 2016 incident within the required thirty-day time frame set forth in Administrative Directive 9.6, and his administrative remedies were rejected for that reason. Although the official who rejected his Level-2 appeal checked off a box indicating that he 'exhausted the Department's Administrative Remedies,' it is clear from the written decision in that document that the official's intent [] was to inform the plaintiff that he could no longer seek administrative appeal[.]" *Paschal-Barros*, 2019 WL 2720739, at *5. Again, neither estoppel nor availability of administrative remedy were addressed because *before* the *Paschal-Barros* defendants checked that box, the plaintiff had already failed to timely exhaust his administrative remedies. *Id.* at *6.

Next, *Solman v. Corl*, No. 3:15-CV-1610 (JCH), 2018 WL 2337129 (D. Conn. May 23, 2018), is irrelevant to this action for the reasons that Defendants provide in their own explanatory parenthetical: That case found "no exhaustion where DOC official checked the box stating the plaintiff had exhausted because *the claim he exhausted was not the same as the one he attempted to advance in court.*" Def.'s Supp. Rep. Br. at 2 (emphasis added). If anything, the *Solman* court's reference to "the claim he exhausted" supports this Court's view that the checked box indicated that at least some claim was exhausted.

Only one cited case remains. And, yet again, that case turned on timeliness issues antecedent to the checked box: "Plaintiff's grievance was procedurally deficient when it was filed, and he cannot cure that deficiency based on how prison officials did or did not respond," and "[t]he check mark indicates that plaintiff can no longer pursue his grievance administratively *because it was untimely*, which by definition means that he has not properly exhausted administrative remedies under the

        2.        **The size of the fez**

Defendants also raise failure-to-exhaust arguments specific to each of Richard's two claims. First, they argue that Richard is not clearly likely to succeed in showing exhaustion of administrative remedies as to the size of the fez. They contend that Richard's failure to specifically raise the issues of the size of the fez and its tassel at any point before filing suit prevents him from showing a clear likelihood of success as to exhaustion of this claim. Here, the Court agrees with the Defendants. Richard's initial fez request, directed to the Religious Review Committee, described a "burgundy" fez, but said nothing about the size of the fez.[24] Nor was the size of the fez mentioned in his subsequent Form CN 9601, filed as a request for informal resolution.[25] And the size of the fez was likewise absent from Richard's Level 1 and Level 2 Grievances.[26]

Throughout the administrative process, therefore, Richard never addressed the size of the fez. And there is no evidence in the record indicating that prison administrators knew that Richard sought a fez of such substantial height, either in the form of testimony from those administrators or contained within the records of the administrative denials that Richard received. This alone is enough to bar Richard from showing a likelihood of success as to his

---

PLRA." *Riles v. Bannish*, No. 10-CV-652 (RNC), 2015 WL 5796999, at *3 (D. Conn. Sept. 30, 2015), *aff'd sub nom. Riles v. Buchanan*, 656 F. App'x 577 (2d Cir. 2016) (emphasis added).

Certainly, these cases show that checking such a box does not cure a prisoner's prior failure to exhaust. But none of these cases so much as address the issue presented by this action: Whether a checked box that *causes* a purported failure to exhaust estops prison officials from raising the defense of non-exhaustion.

[24] Def.'s Ex. A, ECF No. 80-2, at 2.

[25] Def.'s Ex. C, ECF No. 80-2, at 6.

[26] Def.'s Ex. E, ECF No. 80-2, at 10–11; Def.'s Ex. F. at 13.

claim regarding the size of the fez: Richard cannot show that he "provide[d] enough information about the conduct of which they complain to allow prison officials to take appropriate responsive measures," *Fluker*, 2024 WL 506578, at *1, and he therefore cannot show that this claim is likely to proceed to a merits evaluation.[27]

That conclusion is furthered, however, by the fact that Richard failed to raise his request for a fez of a specific size throughout most of this litigation. During the evidentiary hearing in this matter, for example, Defendants' counsel repeatedly discussed that the fez extended above the head by a few inches. Specifically, Counsel described the fez as projecting "a couple of inches" beyond the head[28] or "several inches" above the head,[29] and as sitting "about ten inches or eight inches off the head."[30] In fact, Richard's own words disclaim that, at that time, he knew of a particular size requirement for the fez: When asked about the size of the fez, Richard answered only that he was "not sure how far it extends off" the head.[31]

The exchanges regarding the size of the fez in this hearing never prompted Richard to raise even a non-specific claim that the size of the fez was important, even more than four and a half years after the start of this litigation. Of course, raising the issue at an evidentiary hearing for a preliminary injunction motion likely could not have cured a prior failure to exhaust. Still,

---

[27] The same reasoning applies to Richard's request to purchase the book *Nationality, Birthright, and Jurisprudence*, which he mentioned in passing in briefing. *See, e.g.*, Pl.'s Opening Br., ECF No. 92, at 17. This request is perhaps moot, Def.'s Opp. Br., ECF No. 95, at 35 n.10, but it is certainly not encompassed in the relief requested in Richard's original motion. The Court therefore cannot adjudicate this request.

[28] Evidentiary Hrg. Tr. June 2, 2021, ECF No. 76, at 55 (hereinafter, "Evidentiary Hrg. Tr.").

[29] *Id.* at 68.

[30] *Id.* at 123.

[31] *Id.* at 33.

Richard's responses to the discussion of size of the fez underscore exactly how late this issue arose in the lifespan of the broader dispute over the fez. Nor is there any evidence that the discussion of the fez plainly encompassed the idea that a fez had to be eighteen inches tall. Instead, during the hearing, both Parties appeared to understand a fez to be much smaller than eighteen inches.

At bottom, the dispute over the fez's size appears to have entered the record only in response to Defendants' offer to allow Richard to purchase and wear a fez in some circumstances. For exhaustion purposes, however, the entrance of a dispute into the record through supplemental briefing filed nearly seven years into the lifespan of a federal action is far from clearly likely to satisfy the PLRA's exhaustion requirements.

In briefing, Richard contends that the Defendants "have presented no evidence whatsoever as to how a [] fez of eighteen inches versus a [] fez of twelve inches would adversely affect these security interests."[32] Defendants, for their part, offer that "[t]here is nothing in the record to support why wearing a [] fez that is taller than 12 inches . . . is mandated by Plaintiff's practice of [his] faith."[33] Both statements are correct: Neither party has introduced *any* evidence directly relating to the size of the fez. But building a record is one of the most important benefits of any exhaustion requirement, and the absence of such a record only underscores Richard's probable failure to exhaustion here. The Court agrees that Richard has not demonstrated a clear likelihood that he will succeed in showing that he exhausted his

---

[32] Pl.'s Supp. Br. at 9–10.

[33] Def.'s Supp. Br. at 20.

administrative remedies with respect to the size of the fez. It therefore denies Richard's request for a preliminary injunction on that issue.

### 3.    The color of the fez

Whether Richard exhausted his administrative remedies as to the color of the fez, however, is a more complicated question. Defendants argue that Richard failed to sufficiently raise the importance of its color by requesting a fez without further description. Though Richard specified that "a fez should be burgundy" in his request to the Religious Review Committee,[34] the color of the fez was not mentioned in any of his filings in the procedures set forth in Administrative Directive 9.6. Further, Richard's current request is for a "red" fez rather than a "burgundy" fez.[35] Defendants therefore contend that Richard "has never filed a single grievance seeking a [red] fez despite his insistence that the color of his fez is the essential fact in his claim," and that "[h]e has therefore failed to exhaust his remedies pursuant to the PLRA."[36]

"[T]he PLRA's exhaustion requirement does require that prison officials be afforded time and opportunity to address complaints internally. In order to exhaust, therefore, inmates must provide enough information about the conduct of which they complain to allow prison officials to take appropriate responsive measures." *Johnson*, 380 F.3d at 697. As an initial matter, Richard (though now counseled) contends that because he filed his grievances in the prison system *pro se*, "they should be construed broadly and realistically, rather than narrowly

---

[34] Def.'s Ex. A at 2.

[35] Evidentiary Hrg. Tr. at 6–7.

[36] Def.'s Opp. Brief at 8.

and technically."[37] Defendants deride this argument as "unsupported and illogical."[38] But caselaw clearly confirms Richard's view. In its own words, the Second Circuit "has found it appropriate to afford *pro se* inmates a liberal grievance pleading standard [although] the grievance may not be so vague as to preclude prison officials from taking appropriate measures to resolve the complaint internally." *Brownell v. Krom*, 446 F.3d 305, 310 (2d Cir. 2006). The Court agrees with Richard and concludes that his grievances "object[ed] intelligibly to some asserted shortcoming." *Id.* at 310.

A fez is commonly understood to be red. For example, Merriam-Webster defines a fez as "a brimless cylindrical or somewhat cone-shaped hat with a flat top that usually has a tassel, is *typically made of red felt*, and is worn especially by men in eastern Mediterranean countries." *Fez*, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/fez (last visited Mar. 21, 2025). The Cambridge Dictionary agrees that a fez is "usually made of red material," *Fez*, Cambridge Online Dictionary, https://dictionary.cambridge.org/us/dictionary/english/fez (last visited Mar. 21, 2025); and the Oxford English Dictionary describes a fez as "of a dull crimson colour," *Fez*, Oxford English Dictionary, https://www.oed.com/dictionary/fez_n (last visited Mar. 21, 2025). In short, that a fez is red is commonly understood, and that alone is enough to defeat Defendants' claim that they were not on notice that Richard sought a red item.

Liberally construed or not, Richard's reference to a "fez"—without more—easily put Defendants on notice that Richard wanted a red item. The PLRA does not require Richard to

---

[37] Pl.'s Supp. Br. at 2 n.1.

[38] Def.'s Supp. Rep. Br. at 3.

provide detailed definitions for every word that he uses. Instead, in conducting a similar evaluation, the Supreme Court sought to discern "the most natural understanding of [plaintiff's] grievances" and concluded that the plaintiff's reference to a "prayer" was sufficient to encompass *audible* prayer" because, "[w]hile it is true that this language did not explicitly reference 'audible' prayer, the language adequately conveyed such a request[.]" *Ramirez*, 595 U.S. at 423–24. Here, Richard's language adequately conveyed a request for a standard—that is, a red—fez.

Richard did more than merely refer to a "fez," though. His initial request specified that "[a] fez should be burgundy."[39] Defendants devote substantial energy to discussing the difference that Richard sees between red and burgundy, apparently implying that this difference prevented them from adequately addressing Richard's request.[40] This argument is unavailing. Again, Merriam-Webster: Burgundy is "a reddish-purple color." *Burgundy*, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/burgundy

---

[39] Def.'s Ex. A at 2.

[40] Def.'s Opp. Br. at 12–13. Defendants quote, among other parts of the discussion, the following exchange at the evidentiary hearing between defense counsel and Richard:

Q: "Okay. So just to clarify, burgundy and flaming red are two different colors; right?"
A: "I guess so. I'm actually not even sure. This thing is red as any other red."
Q: "But again, you corrected me at the deposition. Remember? You told me that it shouldn't be burgundy. It must be flaming red. Right?"
A: "Yeah because I read in a book that said it should be flaming red."
Q "Okay. So I'm not, you know, getting into fashion design here. I'm saying you made the distinction between flaming red and burgundy; right?"
A: "Yes. It should be flaming red, yes."

Evidentiary Hrg. Tr. at 34.

(last visited Mar. 21, 2025).[41] Defendants have not offered any argument that being alerted to "burgundy" as opposed to "red" deprived them of the chance to resolve the complaint internally. Instead, they invite the Court to hold that red and burgundy are sufficiently distinct as to warrant foot-faulting Richard out of court nearly seven years into this litigation due to a difference in shade. The Court declines to do so.

The Court's conclusion is furthered by the ample record evidence that prison administrators were aware that the fez requested was red: In fact, according to their own testimony, the fez's red color was the primary reason that the Religious Review Committee denied Richard's request.[42] And issues presented by the red coloring were the key refrain of the testimony of every defense witness, receiving far more attention by comparison than the burden of searching the fez for possible contraband. In sum, the content of this testimony furthers the Court's conclusion that all involved would naturally have understood a request for a fez to encompass a request for a red object.[43]

The Court therefore concludes that Richard is clearly likely to succeed in showing that he was not required to file a Level 3 Grievance and that his requests sufficiently placed

---

[41] Cambridge and Oxford English are, again, in lockstep with Merriam-Webster and likewise describe burgundy as a type of red, though the Court sees no need to belabor the point a second time.

[42] A member of the committee stated that the "concerns about the fez" were twofold: "Obviously, the size was a concern. It's probably the size of a small coffee can, so a lot of space. And then the color, it just jumps out, you know, this color is of concern." Evidentiary Hrg. Tr. at 189. The same witness later stated, " [T]he red or burgundy was just such a concern. We couldn't consider that[.]" *Id.* at 193.

[43] Richard also argues that, though Defendants' answer did generically preserve a non-exhaustion defense, it did not refer specifically to exhaustion as to the fez's color until more than four years into this litigation. Pl.'s Rep. Br., ECF No. 98, at 11. Because the Court has already concluded that Richard is likely to succeed on this issue, though, there is no need to address this argument in this order.

Defendants on notice that he requested red headwear. Put more simply, the Court concludes that Richard is clearly likely to succeed in defeating the affirmative defense of non-exhaustion as to the color of the fez.

### D.    Clear or substantial likelihood of success on the merits

Because Richard has cleared this preliminary barrier, the Court proceeds to examine whether he has shown a clear likelihood of success on the merits of his RLUIPA claim seeking permission to wear a red fez at all times. A plaintiff cannot receive a mandatory preliminary injunction without demonstrating a clear or substantial likelihood that they will ultimately succeed on the merits of their claims. *Daileader v. Certain Underwriters at Lloyds London Syndicate 1861*, 96 F.4th 351, 356 (2d Cir. 2024). Where, as here, the movant alleges a burden on their constitutional rights, "a strong showing of a constitutional deprivation . . . ordinarily warrants a finding of irreparable harm. Likelihood of success on the merits is therefore the dominant, if not the dispositive, factor." *A.H. by & through Hester v. French*, 985 F.3d 165, 176 (2d Cir. 2021); *see also Ramirez*, 595 U.S. at 433 (holding that movant seeking preliminary injunction under RLUIPA established irreparable harm by showing a burden on the exercise of their religious beliefs because "[b]y passing RLUIPA, Congress determined that prisoners like Ramirez have a strong interest in avoiding substantial burdens on their religious exercise, even while confined").

Under RLUIPA, the plaintiff bears the initial burden of establishing that a prison policy "implicates his religious exercise." *Holt*, 574 U.S. at 360. That burden is twofold: "Although RLUIPA protects 'any exercise of religion, whether or not compelled by, or central to, a system of religious belief,' a prisoner's requested accommodation must [(1)] be sincerely based on a religious belief and not some other motivation," and "[t]he burden on the prisoner's religious

exercise must [(2)] be substantial." *Ramirez*, 595 U.S. at 425 (quoting 42 U.S.C. § 2000cc–5(7)(A)).

Once an RLUIPA plaintiff makes these showings, the burden flips and the government assumes its own twofold burden: It "must 'demonstrate that imposition of the burden on that [plaintiff]' is [(1)] the least restrictive means of [(2)] furthering a compelling governmental interest." *Id.* (quoting 42 U.S.C. § 2000cc–1(a)). And "[t]his allocation of respective burdens applies in the preliminary injunction context." *Id.*

### 1.    Sincerity of belief

Richard first must show that his "requested accommodation [is] sincerely based on a religious belief and not some other motivation." *Ramirez*, 595 U.S. at 425.

The Court concludes that Richard is clearly likely to succeed in showing that his beliefs are sincerely held. At the evidentiary hearing, Richard's testimony regarding his faith was substantial, detailed, and consistent. "As a Moor, we hold to the teachings of Jesus and Prophet Drew Ali as well as Muhammad. But we follow Jesus' guide more than anyone's. And Jesus said, 'when you pray, pray ceaselessly.'"[44] And he explained that his faith has encouraged him to become a "good American citizen[], [a] law-abiding American citizen[]," which "has had the most positive effect on my life, out of anything I've ever done in my life. It has changed me drastically from a violent person."[45]

The Court finds Richard's testimony convincing: He references efforts to research this religion more and expresses a commitment to a set of beliefs, which he has followed for a

---

[44] *Id.* at 16–17.

[45] Evidentiary Hrg. Tr. at 14–15.

number of years. He appears knowledgeable about his religion and expresses a desire to adhere to its teachings. Throughout the evidentiary hearing, he demonstrated familiarity with any number of religious writings and entered many religious publications into evidence.[46] Lastly, if nothing else, Richard's sheer persistence in bringing this suit over nearly seven years suggests that his beliefs are sincere.

Defendants do not believe Richard's beliefs are sincerely held. They invite the Court to closely scrutinize Richard's authenticity, arguing that "the facts shed doubt on the sincerity of his beliefs."[47] They point to (1) the fact that Richard did not seek to wear a fez until 2017, ten years after he first became a member of the Moorish Science Temple of America; (2) that Richard committed an act of violence and threatened another, in contravention of Moorish Science teachings; and (3) that, in the brief period in which he was home free between stints in prison, he did not visit any Moorish Science temples.[48]

The first of these—Richard's failure to request a fez for his first ten years—does little to preclude him from showing that he truly holds the religious beliefs he expresses. For one thing, Richard repeatedly explains that his religious practice has changed as he has learned more about the Moorish religion, and that he continues to seek out opportunities to learn more about Moorish Science practice.[49] Doing so has been hard, Richard testified, because he has

---

[46] Evidentiary Hrg. Tr. at 15–16.

[47] Def.'s Opp. Br. at 19.

[48] *Id.* at 19–20; *see also* Evidentiary Hrg. Tr. at 87.

[49] *See, e.g.*, Evidentiary Hrg. Tr. at 34, 43, 69, 75–76, 83, 85.

had difficulty getting Moorish Science writings into his prisons.[50] And the third supposed failing—that Richard did not visit a Moorish Science temple in the time that he was home between prison sentences—is also understandable. First, Richard was home for merely nineteen days.[51] Simply put, he did not have much time to do so. Second, as Richard explains, he knew that there "are no Moorish Science temples in Hartford," and he wasn't sure whether "there is one in Connecticut."[52]   The lack of in-person attendance is not necessarily strong evidence of a lack of sincere belief. Many Americans who fail to regularly attend in-person religious services doubtlessly maintain sincere religious beliefs. The Court therefore declines to conclude that these are weighty objections.

Defendants' remaining argument is that because Richard has committed acts of violence, he has failed to live up to Moorish Science teachings, and, therefore, the Court should conclude that he does not hold sincere Moorish Science beliefs.[53] This argument is extraordinary. There is perhaps nothing more human than to fail to live up to the teachings of one's religion—even tremendously so—and yet to continue to believe. In the prison context in particular this argument has unfathomable implications. Should courts around the nation

---

[50] *Id.* at 82 ("I'm learning as I go. . . . I tried the older books and literature. They won't let them come in. They're being rejected. . . . And also, it was very — it's very hard to get these teachings; right? So I'm learning as I go along. As time goes on, I'm unfolding unto the truth of this wisdom.").

[51] *Id.* at 87.

[52] *Id.* at 88.

[53] Def.'s Opp. Br. at 20 ("Plaintiff committed a violent crime less than three weeks after being released. He did this despite knowing at the time that the Moorish Science Temple of America renounces violence. Plaintiff further threatened to kill his child's mother in 2011 again while knowing of the importance of rejecting violence to the Moorish Science Temple of America. All of these facts cast considerable doubt as to the actual sincerity of his beliefs and adherence to the tenets of the Moorish Science Temple of America.").

decline to credit the religious beliefs of any inmate who has committed violent crimes but who claim to follow one of the many religions that preach nonviolence? RLUIPA counsels otherwise: Congress and the Executive undoubtedly knew that the Act would apply to numerous offenders who committed crimes in contravention of the teachings of the religions they follow, but RLUIPA contains no clause exempting violent offenders from its protections or applying a presumption against the sincerity of their beliefs.[54] Further, such an inquiry is out-of-step with the way courts around the country have evaluated sincerity: In *Ramirez*, for example, the Supreme Court did not for a second examine the sincerity of Ramirez's beliefs in a nonviolent religion, despite taking pains to carefully describe his shocking acts of violence. *Ramirez*, 595 U.S. at 417, 425–26. This Court agrees with that approach and finds this argument, in a word, unpersuasive.[55]

---

[54] Perhaps the primary impact of the inclusion of this argument is to remind readers of the seriousness of Richard's crimes. If so, this choice is regrettable. For those acts, he certainly has ceded some of his fundamental rights. But, in passing RLUIPA, the elected branches have sought to protect his right to religious practice without consideration of the nature of the crime for which Richard has been sentenced. Those protections govern here.

[55] During the evidentiary hearing, defense counsel repeatedly questioned Richard and other witnesses about connections between Moorish Science and the so-called "sovereign citizen" movement. *See, e.g.*, Evidentiary Hrg. Tr. at 45–48, 93–95, 129–51, 190–91, 218–21; *see also* Def.'s Ex. L–N, ECF No. 80-2 at 28–50.

In response, Richard acknowledged that he was "once led to believe that this was a tenet of [my] faith. . . . I have since found the true teachings of the Noble Drew Ali, and his intent was for us to be good, law-abiding American citizens. . . . A few renegade members have been misled by sovereign terrorist groups, and it is all of our work to eradicate this fraudulent testament [] from good society." *Id.* at 9. And prison administrators acknowledged that, at the time of the hearing, they had no evidence that Richard had demonstrated belief in any sovereign ideology for several years. Evidentiary Hrg. Tr. June 3, 2021, ECF No. 73, at 9.

At least for purposes of this motion, Defendants implicitly abandon in briefing the argument that Richard remains a sovereign citizen, so the Court will consider it no further. Defendants gesture at the idea that allowing Richard to wear a fez would create a slippery slope and allow other sovereign citizens to disobey prison regulations. Def.'s Opp. Br. at 26–27. Because this argument receives only minimal development, however, the Court need not address it.

Richard testified convincingly to his belief system and the development of his faith as a Moorish Scientist. The Defendants' contention that Richard has failed to practice his faith adequately does not convince the Court that his beliefs are insincere. As a result, the Court concludes that Richard is clearly likely to succeed in showing that his religious beliefs are sincerely held.

### 2.    Substantiality of the burden on Richard's religious exercise

RLUIPA next requires that the plaintiff show that "[t]he burden on the[ir] religious exercise . . . [is] substantial." *Ramirez*, 595 U.S. at 424–25. As an initial matter, Defendants contend that Richard is not clearly likely to succeed in showing that wearing a fez is part of his religious expression. They again highlight that Richard did not attempt to purchase a fez during his brief period of freedom and that he did not request a fez until about a decade after he became a Moorish Scientist.[56] Further, they note that—by Richard's own admission—some key holy texts of his faith do not mention wearing a red fez.[57]

The standard established by RLUIPA, however, is a generous one. "Congress defined 'religious exercise' capaciously to include 'any exercise of religion, whether or not compelled by, or central to, a system of religious belief.'" *Holt*, 574 U.S. at 358 (quoting 42 U.S.C. § 2000cc–5(7)(A)). And Congress further "mandated that this concept 'shall be construed in favor of a broad protection of religious exercise, to the maximum extent permitted by the terms of this chapter and the Constitution.'" *Id.* (quoting 42 U.S.C. § 2000cc–3(g)).

---

[56] Def.'s Opp. Br. at 20–21.

[57] *Id.*

In contrast to the religious texts that Defendants point to, Richard repeatedly expresses a personal belief that wearing a red fez is mandated by the key prophet that he follows.[58] More importantly, however, the Court credits Richard's personal testimony as to the centrality of a red fez to his religious practice. In his own words, a red fez "is a hallmark of my belief."[59] "I sincerely believe that without a fez, I am susceptible to evils, and that my fez is a medium of propagation of my spirit to God's spirit and that the red fez, when placed upon my head, places me in that spiritual realm of rapport and union with God. My religious red prayer fez is also a might and power for me mentally and spiritually. We use it to navigate through life, through life's ills."[60]

Richard continued: "Every action that I do, every word that I speak, is supposed to be a form of rapport and prayer with God. If I have my fez on, my body becomes an extension of the fez."[61] "Prophet Drew Ali told the man, and I have it written down in a book, when he told him, 'let me never catch you without this fez, to wear it all the time.'"[62] He has further submitted numerous exhibits showing adherents to and leaders of the Moorish Science Temple of America wearing red fezzes,[63] and has submitted pages from a book detailing that, under Moorish Science practice, he should "not wear any fez but the red fez."[64]

---

[58] *See, e.g.*, Evidentiary Hrg. Tr. at 6–7.

[59] *Id.* at 6.

[60] *Id.* at 7–8.

[61] *Id.* at 17.

[62] *Id.*

[63] *See, e.g.*, Pl.'s Ex. 1–3, ECF No. 92-1, at 3–17.

[64] Pl.'s Ex. 16, ECF No. 92-1, at 50.

At bottom, Defendants' arguments run afoul of RLUIPA's generous standard: Defendants ask the Court to conclude that, as a matter of theological fact, wearing a red fez is not required by Moorish Science practice. But RLUIPA claims turn on the importance of the practice to the individual, not the centrality of the practice to the religion. And Richard is likely to succeed in showing that wearing a red fez is central to *his* religious practice.

Defendants next contest whether the burden imposed by their policy is substantial. "A substantial burden exists where the state puts substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Tanvir v. Tanzin*, 120 F.4th 1049, 1059 (2d Cir. 2024).[65] In a similar context, the Second Circuit has acknowledged that determining the substantiality of a burden "is a task for which courts are particularly ill-suited, [which] raises the danger that courts will make conclusory judgments about the unimportance of the religious practice to the adherent rather than confront the often more difficult inquiries into sincerity, religiosity and the sufficiency of the penological interest asserted to justify the burden." *Kravitz v. Purcell*, 87 F.4th 111, 121 (2d Cir. 2023).[66]

In this case, however, the question is a trivial one. "An incarcerated plaintiff 'easily satisfies' his burden of proving that a prison policy substantially burdens his religious exercise when the policy 'puts him to the choice' between 'engaging in conduct that seriously violates his religious beliefs' or risking 'serious disciplinary action' for adhering to those beliefs."

---

[65] The *Tanvir* plaintiffs brought claims pursuant to the Religious Freedom Restoration Act, but such cases are relevant here "because the statutory provision in [RLUIPA] mirrors RFRA and . . . thus allows prisoners to seek religious accommodations pursuant to the same standard as set forth in RFRA." *Tanvir*, 120 F.4th at 1062 n.7.

[66] *Kravitz* did away with the judge-fashioned "substantial burden test" in the context of First Amendment claims under 42 U.S.C. § 1983 but recognized that RLUIPA included a substantial burden requirement in the text of the statute itself. 87 F.4th at 126 n.12, 128–29.

*Sabir v. Williams*, 52 F.4th 51, 60 (2d Cir. 2022) (quoting *Holt*, 574 U.S. at 361). This is clearly likely to be satisfied where, as here, Richard is banned from wearing a red fez at all times, which is important to his religious practice, a ban that—as this litigation makes clear—Defendants intend to enforce.

### 3.    The government's interest

Once a plaintiff establishes that a policy substantially burdens the exercise of his sincerely held religious beliefs, the burden shifts to the defendants to "prove that their refusal to accommodate the exercise both (1) furthers 'a compelling governmental interest,' and (2) is the 'least restrictive means of furthering that compelling governmental interest.'" *Ramirez*, 595 U.S. at 426–27 (quoting 42 U.S.C. § 2000cc–1(a)). "Under RLUIPA, the government cannot discharge this burden by pointing to broadly formulated interests." *Id.* at 427. Instead, it must "demonstrate that the compelling interest test is satisfied through application of the challenged law [to] the particular claimant whose sincere exercise of religion is being substantially burdened." *Holt*, 574 U.S. at 363. If any "less restrictive means is available for the Government to achieve its goals, the Government must use it." *Id.* at 365.

Defendants contend that their policy of banning red clothing, including red religious headgear, is the least restrictive means of furthering a compelling interest. Here, Richard fails to show that he is clearly likely to succeed in proving otherwise.

The Supreme Court has recognized that "[r]unning a prison is an inordinately difficult undertaking[.]" *Turner v. Safley*, 482 U.S. 78, 84–85 (1987). On the other hand, "RLUIPA's compelling interest test is a strict one: Congress borrowed its language from First Amendment cases applying perhaps the strictest form of judicial scrutiny known to American law." *Yellowbear v. Lampert*, 741 F.3d 48, 59 (10th Cir. 2014) (Gorsuch, J.).

But "the Supreme Court has suggested that RLUIPA's compelling governmental interest test holds an unusual twist in the prison context. Though RLUIPA uses the same linguistic formulation for prison and land use cases, [and] though it uses the same language found in RFRA, the Court has told us that 'context matters.' *Id.* (quoting *Cutter v. Wilkinson*, 544 U.S. 709, 723 (2005)). "So while courts do not usually afford much deference to the government when assessing whether its claimed interest is a compelling one in RFRA or even land use cases arising under RLUIPA, in the prison context the Supreme Court has instructed us to apply 'due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain . . . security . . . consistent with consideration of costs and limited resources.'" *Id.* (quoting *Cutter*, 544 U.S. at 723).

The Court's task, then, is far from straightforward: RLUIPA's text places an extraordinary burden on defendants to show that an asserted interest is compelling and that the policy furthering that interest is narrowly tailored. But in applying that strict standard, the Supreme Court requires due deference to the experience of prison administrators. Put otherwise, the Court must hold Defendants to their high burden, but also accord them deference.

In this case, determining whether the interest asserted is compelling is straightforward. Defendants advance the straightforward proposition that their policy is in furtherance of prison security. And "[p]rison security is, of course, a compelling state interest." *Dunn v. Smith*, 141 S. Ct. 725, 209 L. Ed. 2d 30 (2021) (Kagan, J., concurring in denial of application to vacate injunction). Courts view as particularly compelling the more specific formulation of the claimed interest—in protecting prison safety and security by limiting gang affiliation and violence. "Prison security, imperiled by the brutal reality of prison gangs, provides the

backdrop of the State's interest." *Wilkinson v. Austin*, 545 U.S. 209, 227 (2005). "An interest in curtailing violence within prison walls is compelling," *Borzych v. Frank*, 439 F.3d 388, 391 (7th Cir. 2006), because gangs play a significant role in furthering prison violence: "Clandestine, organized, fueled by race-based hostility, and committed to fear and violence as a means of disciplining their own members and their rivals, gangs seek nothing less than to control prison life and to extend their power outside prison walls," *Wilkinson*, 545 U.S. at 227. The Court therefore concludes that Richard is unlikely to succeed in showing that the Defendants' interest is not compelling.

### 4. Least restrictive means

Ultimately, even if they show a compelling interest, Defendants must still demonstrate that the policy of banning red items and clothing except for religious items in specific places is the "least restrictive means" of furthering that interest. 42 U.S.C. § 2000cc–1(a)(2).

At this stage, Defendants provide ample evidentiary support to demonstrate that Richard is unlikely to successfully prove that they will not meet that burden. Begin with Captain Daniel Papoosha, coordinator of the DOC's statewide Security Risk Group, who testified at length during the evidentiary hearing.[67] Papoosha explained that the Group is for inmates who have "been identified as jeopardizing . . . the safety and security" of the prison— or, as Papoosha described it, the Group exists specifically to focus on gang members.[68]

Managing the gang population, Papoosha testified, is a particularly difficult task due to the "sheer numbers" of gang members, who are sometimes "very crafty in the means that they

---

[67] Evidentiary Hrg. Tr. at 103.

[68] *Id.* at 104–05.

will represent their gang[.]"[69] To avoid identification by prison authorities, gang members will seek to support their gang surreptitiously, by wearing "specific identifiers, colors, bandannas, beads—whatever it may be, sports clothing, specific logos[.]"[70] This is essentially a show of strength, and showing strength is an important part of gang recruitment efforts.[71] Further, perceptions of strength play a critical role in allowing gangs to exert power and influence within prisons, which can lead to violence.[72]

Papoosha testified in great detail about the gang situation in Connecticut's prisons. Specifically, he testified that thirteen identified gangs have a presence in Connecticut prisons, totaling approximately 200 members.[73] About half of those 200 are members of the Bloods, the largest individual gang within Connecticut prisons. The Bloods, Papoosha testified, present a particular problem "[b]ecause of the[ir] sheer numbers . . . and the offshoots of . . . approximately 14 to 15 different facets" that "frequently" fight each other.[74] Fighting between different Bloods subgroups, Papoosha opined, is "more of a problem now than fighting [a]cross affiliations."[75]

And Papoosha described in detail the significance of the color red for the Bloods. "Red is the predominant color that the Bloods represent," and the group also uses black and red in

---

[69] *Id.* at 108.

[70] *Id.* at 109.

[71] *Id.* at 109–10.

[72] *Id.* at 108–11.

[73] *Id.* at 116.

[74] *Id.* at 116–17.

[75] *Id.* at 117.

combination.[76] A red fez adorned with a black tassel, therefore, "could be misinterpreted."[77] Gangs "don't tend to give much room for explanation. [T]hey're [] apt to act with violence right off the rip where, if you don't answer a question specifically or correctly, they may do something right there on the spot. They're not going to wait around for you to give an answer to them."[78] And "Bloods specifically tend to be more rambunctious. They will act faster than others because they are very disorganized, and they tend to act on a whim or, you know, something that just happens. They don't think about long-term effects; they just want to -- they're going to get it in now. Respect is a big thing to them."[79]

Put otherwise, wearing a red item around members of the Bloods could quickly lead to violence because gang members—whether rivals or Bloods members seeking to assert total control over the color red—might view that conduct as a sign of disrespect, and might attack Richard at the drop of a hat. Further, if gang members see red fezzes allowed as part of religious headgear, they might "infiltrate a religion or use religious faith as a cover for their activities."[80] At bottom, Papoosha offered his conclusion that the prospect of an inmate wearing a red fez was "extremely" concerning.[81]

---

[76] *Id.* at 118–19.

[77] *Id.* at 121.

[78] *Id.*

[79] *Id.* at 122.

[80] *Id.* at 126.

[81] *Id.* at 149.

The Court finds Papoosha's testimony highly credible. Because of his position, there is perhaps no other prison official in Connecticut better situated to speak to the best methods of curtailing gang violence in prisons.

Papoosha's testimony was reinforced by the testimony of DOC Deputy Commissioner William Patrick Mulligan.[82] Mulligan explained that gang violence has, in prior eras, led to violent riots within Connecticut's prisons.[83] Mulligan described his particular experience with gang-related violence, including gang-related threats to correctional officers.[84]

Mulligan explained that the denial of Richard's red fez was part of a broader policy for all of the "thousands of inmates with religious affiliations in the [DOC]."[85] Some number have "accommodations for religious headwear," Mulligan explained, "but they're all within the same guidelines of neutral color."[86] And Mulligan affirmed that "inmates are not allowed to wear any kind of secular red-colored clothing items," nor are inmates "allowed to wear any religious red clothing items."[87]

Richard raises significant challenges to the idea that disallowing a red fez is the least restrictive means of furthering a truly compelling interest. A governmental action's "underinclusiveness—its failure to cover significant tracts of conduct implicating the law's animating and putatively compelling interest—can raise with it the inference that the

---

[82] *Id.* at 205–06.

[83] *Id.* at 210.

[84] *Id.* at 210–11.

[85] *Id.* at 213.

[86] *Id.*

[87] *Id.* at 214.

government's claimed interest isn't actually so compelling after all." *Yellowbear*, 741 F.3d at 60. "As the Supreme Court has said, it's sometimes hard to see how a law or regulation can 'be regarded as protecting an interest of the highest order,' as serving a compelling interest, 'when it leaves appreciable damage to the supposedly vital interest unprohibited.'" *Id.* (quoting *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 547 (1993)).

Richard raises several challenges in a similar vein. First, he argues that inmates are allowed to wear many items of clothing that are in gang colors, such as blue face masks and pajamas.[88] But the compelling interest that Defendants identify relates specifically to the Bloods. The difference in treatment makes sense in light of the credible evidence introduced by Defendants that these groups do not present the same concerns as the Bloods. For example, Papoosha explained that the Crips (who claim the color blue) are not as much of a concern because "[t]hey're not as prevalent, they're not as prominent, and the numbers are just not as strong as that of the Bloods."[89] Richard also discusses at length the ability of inmates to purchase black and white beads, which he claims could be used by other gangs.[90] Again, though, he fails to grapple with the specific interest in combatting the presence of the Bloods by preventing the presence of red items. In rebutting these claims, Defendants' whole-cloth policy banning red religious items and red clothing weighs significantly in favor of concluding that the policy is narrowly tailored to a compelling interest.

---

[88] Pl.'s Opening Br. at 12; Evidentiary Hrg. Tr. at 11.

[89] Evidentiary Hrg. Tr. at 153.

[90] *Id.* at 12, 24.

Richard does directly respond to the asserted interest in combatting the Bloods. Chiefly, he contends that the DOC is not consistent in banning or in enforcing a ban on red items. For example, Richard testified that he has a red prayer rug that he is able to "walk around anywhere with."[91] But Mulligan testified otherwise, and stated that Richard's prayer rug must be kept "in his cube to pray and if he goes to collective religious services," but that Richard could not "just walk around with that on [his] shoulders[.]"[92] Richard further introduces an exhibit indicating that, for a period of time, Defendants provided inmates with burgundy face masks.[93] But the Court appreciates that COVID-19 represented a global emergency, and that due to mask shortages at the height of the pandemic, officials may have used whatever materials were available for masks. *See United States v. Sanchez*, No. 18-CR-00140 (VLB), 2020 WL 1933815, at *1 (D. Conn. Apr. 22, 2020) ("[C]orrectional and detention facilities present unique challenges for control of COVID-19 among incarcerated/detained persons, staff, and visitors. In these settings, recommended social distancing and hygiene precautions are more difficult to practice." (citation and quotations omitted)). As a result, absent evidence to the contrary, the Court cannot conclude that the allegation that red masks were used in an emergency renders Defendants' policy against red items a nullity.

At best, Richard can show relatively minor failures to perfectly enforce a policy banning red items. He has not adduced evidence sufficient to allow the Court to conclude that Defendants' policy is so inconsistently enforced as to render it a nullity. And the Court

---

[91] *Id.* at 10; Pl.'s Opening Br. at 12.

[92] Evidentiary Hrg. Tr. at 225.

[93] Pl.'s Ex. 11, ECF No. 92-1, at 42.

therefore cannot conclude that Richard is clearly likely to succeed in showing that Defendants could formulate a more narrowly tailored policy that would nonetheless protect their compelling interest.

Richard further points to two recent cases in which district courts ruled in favor of inmates seeking to wear religious headgear. In the first, a district court issued an order requiring prison officials to allow an inmate to wear a fez. *Marshall v. Corbett*, No. 13-CV-2961 (JMM), 2019 WL 4736224 (M.D. Pa. Sept. 27, 2019). But that case addressed a notably different record. Particularly critical is the asserted governmental interest: in *Marshall*, prison officials contended only that "[c]ontraband may be hidden under a fez." *Id.* at *3. Prison officials did not argue that the fez, in that prison system, presented gang-related issues. And the assertion that a fez would present contraband issues ran headlong into the Supreme Court's rejection of precisely the same interest in the context of beards because, the Court held, beards and hair could simply be searched. *Holt*, 574 U.S. at 364–65. Following *Holt*'s reasoning, the *Marshall* court concluded that searching the fez was a less restrictive policy than banning it outright and was sufficient to further the interest of combatting contraband. 2019 WL 4736224, at *4. *Marshall*'s rejection of a different proffered interest does not change this Court's conclusion as to the specific interest asserted in this case.

The second case Richard relies upon rejected prison official's attempts to block the wearing of kufis outside of cells and religious services. *Ajala v. West*, 106 F. Supp. 3d 976, 979 (W.D. Wis. 2015).[94] There, the prison officials' proffered interest was in preventing

---

[94] A kufi is "a rounded brimless cap for men . . . made of cloth or knitted," *Kufi*, Collins English Dictionary, https://www.collinsdictionary.com/dictionary/english/kufi (last visited Mar. 25, 2025), worn by some Muslim men, *Ajala*, 106 F. Supp. 3d at 979.

prisoners from communicating gang affiliation. That interest is certainly more similar to the interest discussed in this case. But the *Ajala* court's conclusion turned on the details of the kufis themselves: In that case, "all kufis in the prison [were] solid black and [could not] be adorned in any way," a policy that the plaintiff in that action did not challenge. *Id.* at 983. The defendants in that action did not argue that gangs in the prison used the color black, and the court therefore concluded that it was unlikely that such a kufi could communicate a gang-related message. *Id.* Not so in this action, where Defendants have provided specific testimony regarding gang usage of the same color as the requested headgear. And, critically, that usage is not just by any gang, but by the most violent and dominant gang in Connecticut prisons.

*Ajala*, then, only further highlights the importance of the specific circumstances of each case. In that case, limitations on the headwear at issue ensured that it did not implicate specific gang concerns. Here, unfortunately for Richard, headwear in a color that is core to his beliefs directly implicates the most violent and widespread gang in Connecticut's prisons.

Both Papoosha and Mulligan are highly credible witnesses and provided detailed, particularized testimony. The DOC, as Mulligan and Papoosha have jointly explained, faces a significant threat to prison safety from the Bloods. Because the Bloods present a more serious issue than other gangs, and to ensure a minimally restrictive policy, the DOC has not banned clothing of all colors but has banned only red, the color of the Bloods (and, thus, the color most likely to lead to conflict). And, to further narrow the policy to the problem, the DOC has allowed red religious items in cells and in religious services, restricting such items only in the settings in which they are most likely to spark conflict.

Put otherwise, the DOC has tailored a policy to affect only items highly likely to cause conflict and has banned religious versions of those items only from the settings in which they

are most likely to cause conflict. The Court cannot devise—and Richard does not offer—a less restrictive policy that would accomplish the same goal. For that reason, the Court concludes that Richard has not shown that the DOC could further the same interest with some means less restrictive than the ban on red religious items in most shared spaces. Richard has not shown that Defendants are clearly likely to fail to meet the burden RLUIPA puts upon them, and therefore he has not shown a clear likelihood of success on the merits. Because he cannot meet his burden as to this "dominant, if not [] dispositive, factor," *A.H. by & through Hester*, 985 F.3d at 176, the Court must deny his motion for a preliminary injunction. [95]

\* \* \* \*

Congress enacted RLUIPA specifically to protect religious exercise in "the prison context, where it is so easy for governmental officials with so much power over inmates' lives to deny capriciously one more liberty to those who have already forfeited so many others." *Yellowbear*, 741 F.3d at 52–53. But, particularly given the complexities of prison administration, even the high standard RLUIPA imposes on government officials is not unattainable. Today, the Court concludes that Richard is clearly likely to succeed in showing that the prison's denial of his request to wear a red fez at all times substantially burdens the exercise of his religion. Nonetheless, the Court denies Richard an initial remedy for that burden because of the DOC's particular interest in preventing violence by curbing the power of the Bloods within its institutions.

---

[95] Because Richard has not shown that he is clearly likely to succeed on the merits of either of his RLUIPA claims, the Court does not need to evaluate the other preliminary injunction factors and declines to do so on the limited record before the Court at this stage.

But the Court emphasizes that today's decision is on the basis of a limited, preliminary record. This ruling does not end this litigation. Richard's burden at this stage in the litigation is substantially higher than his burden in future stages, and even though Richard could not show a clear likelihood of success today, he may nonetheless ultimately succeed.

III.   **CONCLUSION**

For the reasons set forth above, the Court **denies** Richard's motion for a preliminary injunction.

**SO ORDERED.**

Hartford, Connecticut
March 25, 2025

/s/Vernon D. Oliver
VERNON D. OLIVER
United States District Judge